In re the Marriage of Mark S. NILL,
Appellant–Respondent Below,

v.

Karen NILL, Appellee–Petitioner Below.

No. 43A03–9101–CV–00013.

Court of Appeals of Indiana,
Third District.

Jan. 21, 1992.

Rehearing Denied March 11, 1992.

John F. Lyons, Barrett & McNagny, Fort Wayne, appellant-respondent.

Stephen P. Rothberg, Fort Wayne, for appellee-petitioner.

STATON, Judge.

Mark Nill appeals the decree dissolving his marriage with Karen Nill. In particular, Mark contends that the trial court abused its discretion in dividing the marital property and in calculating child support payments.

Affirmed, as modified.

On April 21, 1989, Karen filed a petition for dissolution of the parties' marriage of fifteen years. The court held a dissolution hearing on September 24, 1990, and, pursuant to Mark's request for special findings and conclusions, entered findings and conclusions in the final decree dated October 11, 1990. The court found that the net assets of the marital estate totalled $737,-488, $51,337 of which was allocated to Karen. In order to effect the statutory presumption of an equal share in the marital assets, the court awarded Karen a monetary judgment of $317,407.[1] The trial court awarded custody of the parties' three children to Karen, and ordered Mark to pay child support in the amount of $2,100 per month. Mark now alleges that the court's calculation of marital property is erroneous in several respects, and that the award of child support is an obligation of such magnitude that it amounts to an economic penalty.

## I. DIVISION OF MARITAL PROPERTY

■ The trial court has broad discretion in ascertaining the value of property in a dissolution action, and its valuation will not be disturbed absent an abuse of that discretion. *Neffle v. Neffle* (1985), Ind. App., 483 N.E.2d 767, 770, *trans. denied.* The trial court does not abuse its discretion if there is sufficient evidence and reasonable inferences therefrom to support the result. *Id.* In other words, we will not reverse the trial court unless the decision is

---

1. $737,488 divided by 2 equals $368,744, less assets allocated to Karen of $51,337, equals $317,407.

clearly against the logic and effect of the facts and circumstances before it. *Porter v. Porter* (1988), Ind.App., 526 N.E.2d 219, 222, *trans. denied.* As a reviewing court, we will not weigh evidence, but will consider the evidence in a light most favorable to the judgment. *Id.* In addition, the party challenging the trial court's property division must overcome a strong presumption that the court complied with the statute. *Id.*

We also observe that the trial court entered special findings pursuant to Mark's request under Ind. Rules of Procedure, Trial Rule 52(A). Special findings of fact and conclusions of law are reviewed under the following standard: we first must determine whether the evidence supports the findings; then we determine whether the findings support the judgment. *Kaminszky v. Kukuch* (1990), Ind.App., 553 N.E.2d 868, 870, *trans. denied.* The judgment of the trial court will be affirmed if we conclude that the special findings support the judgment and are not clearly erroneous. *Brancheau v. Weddle* (1990), Ind.App., 555 N.E.2d 1315, 1317. A judgment is clearly erroneous where a review of the record leaves us with a firm conviction that a mistake has been made. *Indiana Dep't of Correction v. Stagg* (1990), Ind.App., 556 N.E.2d 1338, 1341, *trans. denied.*

### A. Personal Property.

In its findings, the trial court determined that "the parties respectively own household goods, furnishings, personal effects and jewelry, which are of approximately equal value and the principal value of which lies, not in an economic sense, but in their use." Record, p. 100. The court then awarded each party the property in their respective possession. Mark contends that the trial court ignored the value of this property in computing the total marital estate subject to division.

At the dissolution hearing, Karen opined that Mark's personal property was at least of equal value to her own. However, Karen's summary of assets listed the value of her personal property as $21,125, while similar property in Mark's possession was valued at no more than $9,000. This amounts to a difference of $12,125. Karen maintains that the trial court merely accepted as true her opinion of the property's value. Yet the court's findings indicate that this was not the case, determining that the value of the property was equal in its "use," not "in an economic sense."

Indiana law has been uniformly interpreted as requiring the trial court to divide "all" the property of the parties, specifically prohibiting the exclusion of any assets from the scope of the court's powers to divide and award. IND. CODE 31–1–11.5–11(b) (Supp.1991); *In re Davidson* (1989), Ind.App., 540 N.E.2d 641, *reh'g denied; Lord v. Lord* (1982), Ind.App., 443 N.E.2d 847. "[T]he trial court has the right and a duty to settle and determine the property rights of parties in a dissolution case including rights in money, in physical assets, or in both." *White v. White* (1981), Ind. App., 425 N.E.2d 726, 728. The court clearly intended to equally divide the marital property in accordance with the statutory presumption; therefore, its failure to consider the value of personal property was clearly erroneous, and an abuse of discretion.

Nor do we regard the exclusion of personal property a "de minimis" omission as contended by Karen; the trial court saw fit to include assets worth far less than $30,125 (the combined value of personal property in this case) in its calculations. The trial court is instructed to reduce the monetary payment to Karen by $6,062.50 to effect an equal distribution of the marital estate.[2]

### B. Federal Tax Refund.

The parties filed a federal joint tax return for the 1989 tax year, and received a refund check of $27,000. The trial court included the tax refund in its calculation of marital assets. Mark contends that the

---

**2.** $30,125 divided by 2 equals $15,062.50, which subtracted from the assets awarded to Karen ($21,125) equals $6,062.50.

court erred by characterizing the entire refund as marital property because he was the sole wage earner, and he earned two-thirds of his income after the parties became separated in April, 1989. At most, he argues, the trial court should have included $9,000, one-third of $27,000, in the amount of property subject to division.

■ It is true that property acquired after final separation is generally not subject to division as a marital asset. *In re Marriage of Hirsch* (1979), 179 Ind.App. 166, 385 N.E.2d 193. However, we do not necessarily agree with Mark's contention that the tax refund constitutes such after-acquired property.

The precise issue concerning the allocation of a tax refund from a jointly filed income tax return has not yet been addressed in Indiana. To our knowledge, the only case in which this specific issue was decided is *Angelo v. Angelo* (1980), 74 A.D.2d 327, 428 N.Y.S.2d 14. As in this case, the parties in *Angelo* filed a joint income tax return, though the income was attributable solely to the husband's salary. The court in *Angelo* considered a number of factors, including the tax statutes, the common law, dissolution statutes, and an analysis of the circumstances of the parties' marriage to arrive at its determination.

The New York court first noted that the parties were no doubt swayed by the pecuniary advantage to the family as a whole in filing jointly. Doubtless such a pecuniary advantage likewise influenced the parties to this appeal. As an additional benefit to Mark, upon signing the return Karen became jointly and severally liable for payment of any tax owed. *See* 26 U.S.C.A. § 6013(d)(3) (1989). "But where the advantages are taken, the burdens must also be accepted." *Angelo* at 331, 428 N.Y.S.2d at 16. Mark seeks to enjoy the benefits of filing jointly, but disclaim the burdens.

The *Angelo* court also noted that the filing of a joint return in one jurisdiction creates a joint interest, entitling the decedent's surviving spouse to the proceeds of the tax refund, even though the decedent's earnings composed the bulk of the income

reflected by the return. *Id.* at 332, 428 N.Y.S.2d at 17 (citing Pennsylvania case law). On the other hand, in bankruptcy law, title to a tax refund is generally not vested in the non-income producing spouse by virtue of the joint return, and the bankruptcy court will not presume that the insolvent spouse intended to make a gift of the proceeds to his or her spouse. *Id.* (citations omitted).

Rather than relying on the rigid application of a mechanical formula to determine the allocation of an income tax refund, the court in *Angelo* reviewed the circumstances of the general financial background of the marriage. As the court observed:

The financial arrangements between husband and wife are intensely personal; what suits one household would throw another in disarray. Sometimes the spouses join in discharging the financial responsibilities of the family; sometimes one spouse defers to the other in managing their affairs. Sometimes they agree to keep their individual earnings and property separately; sometimes they agree to merge them. Sometimes their agreement is formal; in most instances it is not.

\* \* \* \* \* \*

In this case the [husband] was the wage earner, and the refund was derived from his income. It may fairly be decided that the joint return was filed for no other purpose than to obtain an advantage which the tax statutes were designed to provide.

Nevertheless, the financial arrangements between the parties show that the [wife] and the [husband] had equal interests in the refund. The parties had maintained joint accounts established for the keeping and disbursement of their funds. The evidence demonstrated that the sums on deposit in the joint account were sizable, as was the tax refund payable to them. Special Term might justifiably draw the inference that it was intended by the parties that each was empowered to draw on the funds, no matter what may have been the original source,

and that each had an equal interest in the accounts. So Special Term found with respect to the balance in the accounts, and this finding we have affirmed. If the marriage had continued, Special Term could conclude as a permissible inference that the refund check would have been deposited as well into a joint account, or, even if there had been no joint account, Special Term could have concluded that, under the circumstances of the marriage, the money would have been shared by the parties.

*Id.* at 333–34, 428 N.Y.S.2d at 17–18.

We find this analysis persuasive, and applicable to this case. Here, the Nills not only maintained joint accounts, but Mark actually deposited the (sizable) refund check in the joint account. The evidence demonstrated that each party had responsibility for discharging the financial obligations of the family. Considering also the fact that the tax refund would not have been so substantial had the parties elected to file separately, we find that the trial court acted properly by including the tax refund in property subject to division.

### C. Ft. Wayne Tool & Die.

■ Mark next alleges that the trial court erred by including the value of his interest in Fort Wayne Tool and Die, Inc., an interest he received from his father when Mark was a child. Karen responds that the court has the latitude to consider such assets by virtue of the plain language of the dissolution statutes. The relevant provision states, in part:

> In an action [for dissolution], the court shall divide the property of the parties, *whether owned by either spouse prior to the marriage,* acquired by either spouse in his or her own right after the marriage and prior to final separation of the parties, or acquired by their joint efforts, in a just and reasonable manner[.]

IC 31–1–11.5–11(c) (emphasis added).

There is no dispute that Mark's interest in the company was property owned by him prior to the marriage. Mark argues, however, that the court failed to consider the circumstances surrounding the acquisition of this interest, and a proper consideration of these circumstances would have led the court to exclude his interest in the company from its calculations. In other words, Mark acknowledges that this interest qualifies as marital property under the dissolution statutes, but he contends that an equal distribution of marital assets including his share of the company would not be "just and reasonable."

The presumption that an equal division of marital property is just and reasonable may be rebutted by evidence, including evidence of the following factors:

> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
>
> (2) The extent to which the property was acquired by each spouse prior to the marriage or through inheritance or gift.
>
> (3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in that residence for such periods as the court may deem just to the spouse having custody of any children.
>
> (4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.
>
> (5) The earnings or earning ability of the parties as related to a final division of property and final determination of the property rights of the parties.

IC 35–1–11.5–11(c).

The first factor is of little concern, as neither party contributed to the acquisition of the asset. The second factor is entitled to some weight, as Mark's share in the company was given to him by his father. As to the third, the trial court could have properly found that this factor weighed in favor of Karen, who had relatively few assets and custody of the parties' three minor children. While the parties do not argue that the fourth factor has relevance to this appeal, the last factor, relating to earnings or earning ability of the parties, may alone justify inclusion of the asset in the marital estate. The evidence indicated

that Karen was primarily a homemaker for the duration of the marriage, and that she had limited vocational skills.

Considering the factors enumerated above, we are not persuaded that the trial court's inclusion of Mark's interest in Fort Wayne Tool and Die in the division of assets was clearly against the logic and effect of the facts before the court. *See Porter, supra,* at 222.

D. Assumption of Mortgage Debt.

 Next, Mark contends that the trial court abused its discretion by ordering him to hold Karen harmless from a second mortgage on the parties' home. This second mortgage, with a balance of $56,982, secured a loan to Mark's business, Pease Windamatic Systems. In its order, the trial court determined:

> That the petitioner and the respondent are now each vested with the title to the Lake Wawasee home constituting real estate in Kosciusko County, Indiana, each have an undivided one-half interest and as tenants in common and that the tenants by the entirety previously existing between them is severed. And with respect to any indebtedness existing with respect to that real estate, the parties shall discharge that indebtedness in their respective interests and as tenants in common.

Record, p. 102. However, later in the decree, the court concluded:

> That as between the parties hereto [Mark] shall pay and discharge the indebtedness of the parties to Pease Windamatic Systems, Inc., to the bank card and to Trumbull Associates in the sum of $82,424 and shall hold [Karen] harmless with respect thereto and indemnify her against any loss with respect thereto inclusive of costs and attorney fees incurred in making the indemnity effective.

Record, p. 103.

Mark argues that he is not required to indemnify and hold Karen harmless for the second mortgage balance because the trial court ordered "any indebtedness" on the marital residence to be discharged in the parties' "respective interests and as tenants in common." Assuming that Mark is correct, he has nevertheless failed to demonstrate how he was harmed by the error. In its findings, the trial court deducted the second mortgage from the indebtedness referred to in order to compute Mark's total assets. Had the court instead deducted only half of the second mortgage balance from Mark's assets, the other half would have been deducted from Karen's total. The result would have been to increase the court's award to Karen by an amount equal to one-half of the second mortgage balance. The trial court's judgment ordering Mark to indemnify Karen and hold her harmless for the second mortgage was entered to effectuate the equal division of the marital estate. Mark was not prejudiced by this determination. *See* T.R. 61; *In re Sloss* (1988), Ind.App., 526 N.E.2d 1036.

E. Valuation of Pease Windamatic Systems.

 Mark next takes issue with the trial court's valuation of his interest in Pease Windamatic Systems, Inc. (Pease). In support of its conclusion that Mark's interest in Pease amounted to $350,000, the court stated:

> In explanation of the valuation of Pease Windamatic Systems, Inc., the Court has reviewed the valuation evidence presented by both of the parties and find both valuations to be sound in light of the theories upon which they proceed. However, the Court notes particularly that the debt to equity ratio of the Corporation is about 8 to 1, which suggests that that company is in deep trouble and very well may not be able to survive. The Court, therefore, finds that as between the two extremes of valuation that the valuation fixed by the Court seems reasonable.

Record, p. 101.

The value of Mark's shares of stock in Pease, where he is vice-president of electrical engineering, was disputed by the parties. Karen presented evidence from an accountant, James Stump, experienced in the valuation of interests in closely held corporations such as Pease. Stump testified that after an extensive review of Pease's financial records, the value of

Mark's one-hundred and seventy shares in the corporation was not less than $523,600. Stump considered six variously weighted values for Mark's stock: adjusted book value, the recent sale of stock to a new stockholder, two formulas based on Pease's buy-sell arrangement, and two formulas based on the goodwill of the company. He then computed the weighted average value of Mark's shares to arrive at the result.

Mark disputes these calculations, arguing that the value of the stock should be determined with reference to the buy-sell agreement in the context of an arm's-length transaction. Rhett Burgess, Pease's chief financial officer and former certified public accountant, opined this value to be $186,431. Karen contends that Indiana law allows a court to consider evidence other than the terms of a buy-sell agreement.

In the *Porter* case, for example, the First District Court of Appeals was asked to value a shareholder's stock in a professional corporation in accordance with the terms of his stock purchasing agreement. The trial court considered not only the shareholder's tangible assets, but also the intangible assets of the corporation (in *Porter,* the "goodwill" of the company). The court of appeals affirmed, noting that "the vast majority" of foreign jurisdictions to address the issue hold that "goodwill of a professional practice is property which should be included among the assets distributed upon the marriage dissolution." 526 N.E.2d at 224. Although mindful that the case before us does not deal with a professional practice, goodwill is most often associated with commercial ventures. *Id.* (citing *Marriage of Lukens* (1976), 16 Wash.App. 481, 558 P.2d 279, *review denied* ).

Mark suggests that we eschew the methodology employed by Mr. Stump in arriving at his valuation as "inherently speculative and unreliable," claiming that Stump failed to consider restrictions on the transfer of the stock. Mark relies chiefly upon *Amodio v. Amodio* (1987), 70 N.Y.2d 5, 509 N.E.2d 936, 516 N.Y.S.2d 923, for the proposition that a court is at liberty to disregard the opinion of an expert who fails to consider such restrictions. In *Amodio,* the plaintiff's expert appraised the defendant's 15% interest in a closely held corporation as falling somewhere between $172,000 and $253,000, without considering the stock transfer restrictions contained in the shareholders' agreement. The trial court concluded that the stock was worth $87,500, the actual value of the stock as reflected by the transfer restrictions in the shareholder's agreement, and the Appellate Division affirmed. Commenting on the methods used to value the interest in a closely held corporation, the New York Court of Appeals observed:

> Whatever method is used, however, must take into consideration inhibitions on the transfer of the corporate interests resulting from a limited market or contractual provisions. If transfer of the stock of a closely held corporation is restricted by a bona fide buy-sell agreement which predates the marital discord, the price fixed by the agreement, *although not conclusive, is a factor which should be considered.* The decisions below, however, could be read as indicating that the courts found the price fixed in the agreement controlling because under the agreement the stock was not currently transferable. That the stock could not immediately be sold is not dispositive; marital property may have a value to the holder notwithstanding that it has no present market value. The court must consider all the circumstances reflecting on the present worth of the property to the titleholder. *It need not rely solely on the price set forth in a buy-sell agreement if other evidence exists.*

*Id.* at 7–8, 509 N.E.2d at 937, 516 N.Y.S.2d at 924 (emphasis added; citations omitted).

We are not convinced that this case conclusively supports Mark's position that reversal is warranted where a valuation does not take into account buy-sell restrictions in a shareholder's agreement. However, we need not resolve the issue at this time. We find that, in this case, Mr. Stump did consider such restrictions in his estimates.

On cross-examination, the following exchange occurred:

Q. In none of your numbers do I find that you have discounted any of your numbers by the marketability of this stock, is that true?

A. No, it's not true. One of the reasons you don't see a distinct marketability discount as opposed to a minority discount in two of the calculations or a marketability discount with respect to the other calculations, is a new shareholder did just buy into the company. He bought into the company at a price equivalent to $750,000.

Record, p. 239. In other words, Mr. Stump considered the buy-sell restrictions in the agreement, but gave little or no weight to the restrictions in light of the recent stock advance to another Pease employee.

Karen cites to a number of cases for the view that values established by a buy-sell agreement are not binding on the court, but may be considered in light of all the circumstances and its provisions. *See, e.g., Bosserman v. Bosserman* (1989), 9 Va. App. 1, 384 S.E.2d 104; *Bowen v. Bowen* (1984), 96 N.J. 36, 473 A.2d 73. *See also Porter, supra,* at 223–24; *Amodio, supra.* We agree with this holding, and find that the trial court had ample evidence with which to evaluate Mark's interest in Pease. The valuation of $350,000 was not against the logic and effect of the facts and circumstances before the court. *See Porter, supra,* at 222.

### F. Tax Consequences.

▮ Mark contends that the onerous financial burden placed upon him by the court's award to Karen would compel him to liquidate his interest in Pease, and that the court erred by failing to consider the tax consequences of such a sale. However, Karen correctly notes that *"only* tax consequences necessarily arising from the plan of distribution are to be taken into account, not speculative possibilities. The statute specifically limits the trial court to consider only the tax consequences *'of the property disposition.'"* *Harlan v. Harlan* (1989), Ind.App., 544 N.E.2d 553, 555 (emphasis original) (citing IC 31–1–11.5–11.1), *aff'd* (1990), Ind., 560 N.E.2d 1246.

Given Mark's substantial income and the assets at his disposal, we cannot say that the sale of Mark's interest in Pease would be anything other than a speculative venture. There was no inherent and necessarily incurred tax consequence to be considered; therefore, the trial court did not abuse its discretion in this regard. *See also DeHaan v. DeHaan* (1991), Ind.App., 572 N.E.2d 1315, 1327–28.

### G. Valuation of Trumbull Associates.

Mark also challenges the trial court's valuation of his interest in Trumbull Associates, a limited partnership (Trumbull). At the time the parties became separated, Mark was over $40,000 in debt to the partnership. Prior to final separation, Mark drafted a $20,000 cashier's check from the funds in his savings account. After separation, he used this check to reduce his debt to Trumbull to a balance of $21,102. He now argues that the court included the cashier's check in the summation of his assets, but failed to consider the Trumbull indebtedness. This argument has no merit.

As we stated above, the trial court ordered Mark to:

pay and discharge the indebtedness of the parties to Pease Windamatic Systems, Inc., to the bank card and to Trumbull Associates in the sum of $82,424 and shall hold the petitioner harmless with respect thereto and indemnify her against any loss with respect thereto inclusive of costs and attorney fees incurred in making the indemnity effective.

Record, p. 103.

The record reveals that the parties stipulated the second mortgage in favor of Pease had a balance of $56,982, and the evidence reflects a bank card balance of approximately $4,500. Thus, the indebtedness to Trumbull consisted of no more than $21,000, a figure that closely jibes with the balance owed by Mark following his payment from funds that would have otherwise been included in the marital estate. Therefore, it is abundantly clear that the

trial court considered the correct amount of Mark's indebtedness, and then subtracted his liabilities to arrive at net assets. It was well within the trial court's discretion to consider the $20,000 taken from his savings account prior to final separation. *See White, supra,* 425 N.E.2d at 728.

## II. SUPPORT PAYMENTS

■ For his final allegation of error, Mark alleges that the award of support for his three children is so excessive as to constitute an economic penalty. The trial court established Mark's support obligation as $2,100 per month, approximating the presumptive amount under the Indiana Child Support Guidelines. Mark decries the court's "slavish adherence" to the Guidelines, alleging that such an award "unjustifiably exacerbates" his precarious financial condition, given the other obligations imposed upon him.

■ Support awards determined under the Child Support Guidelines are presumptively correct. *Gielsdorf–Aliah v. Aliah* (1990), Ind.App., 560 N.E.2d 1275, 1276. "An obligor who seeks a deviation from the guideline amount must present evidence such that the court can conclude that an order for the guideline amount would be unjust or inappropriate under existing circumstances." *Id.* at 1278. As Karen observes, Mark has not identified those portions of the record where he submitted evidence to demonstrate that the presumptive amount under the Guidelines is unjust or inappropriate. Therefore, the award of support is affirmed.

## CONCLUSION

We conclude that the award to Karen should be reduced by the amount of $6,062.50 to reflect the value of personal property erroneously omitted from the marital estate. *See* Issue I–A, *supra.* In all other respects, the trial court is affirmed.

HOFFMAN and CHEZEM, JJ., concur.